# UNITED STATES DISTRICT COURT
for the
Northern District of Texas

ORIGINAL

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED
2015 APR 22 AM 9:33
DEPUTY CLERK

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No. 5-15MJ00033
310 N 8th Street, Wolfforth, Texas )
(Subject Premises #1) )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
310 N 8th Street, Wolfforth, Texas, more fully described in Attachment A, which is attached and fully incorporated herein.

located in the ____Northern____ District of ____Texas____, there is now concealed *(identify the person or describe the property to be seized)*:
See attachment B, which is attached and fully incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841 and 846 | Violations of the Controlled Substances Act. |
| 18 USC 1956 and 1957 | Laundering of Monetary Instruments. |

The application is based on these facts:
See attachment C, which is attached and fully incorporated herein.

☐ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
AUSA

_____
Applicant's signature

IRS Special Agent Gregory Hand
Printed name and title

Sworn to before me and signed in my presence.

Date: April 22, 2015

_____
Judge's signature

City and state: Lubbock, Texas

Nancy M. Koenig, United States Magistrate Judge
Printed name and title

**ATTACHMENT A -**
**Description of Premises to be Searched**

**Subject Premises #1**
**310 N 8th Street, Wolfforth, Texas**

The premises to be searched is located at 310 N 8th Street, Wolfforth, Texas. It is a single-family residence located on the North side of 8th Street near the intersection of 8th Street and Hutcheson Avenue. The residence is a single story brick home with a concrete walk entrance at the front of the home and driveway/garage access via an alleyway at the rear of the residence.

To include all outbuildings, vehicles and appurtenances on the property.





Page 1 of 3



LUBBOCK COUNTY, TEXAS

LOT 5

PRESTON PARK, an Addition to the City of Wolfforth, Lubbock County, Texas, according to the map, plat and/or dedication deed thereof recorded in Volume 9639, Page 246, Official Public Records of Lubbock County, Texas

310 N. 8th Street (not visible)



CERTIFICATION TO: Service Title Co.
FOR: GF# 94031-B Phillips ONLY

I, Brent Carroll, Texas Registered Professional Land Surveyor No. 5410, do hereby certify that this survey was made on the ground and is in substantial compliance with Standard TREC Contract Form No. 20-6. A determination as to whether this property lies within a special flood hazard area was not made for this survey.
April 5, 2006

Brent Carroll
Registered Professional
Land Surveyor No. 5410
State of Texas



WARNING
This plat is invalid unless it bears an original signature across an embossed seal.

HUGO REED AND ASSOCIATES, INC.
LAND SURVEYORS · CIVIL ENGINEERS
1601 AVENUE N    LUBBOCK, TEXAS 79401
PHONE: (806) 763-5642    FAX: (806) 763-9991

Copyright 2006, Hugo Reed and Associates, Inc. for the sole use of Title Co. for GF# and any other identifiers as indicated in the certificate shown hereon.

## ATTACHMENT B - ITEMS TO BE SEIZED

The following items which constitute evidence, fruits and instrumentalities of violations of Title 18 U.S.C. §§ 1956 (laundering of monetary instruments), and 1957 (engaging in monetary transactions in property derived from specified unlawful activity) and Title 21 U.S.C. §§ 841 (distribution of a controlled substance) and 846 (conspiracy to distribute a controlled substance).

A. Books, records, receipts, notes, ledger and other documents relating to transporting, ordering, purchasing, manufacturing and/or distributing controlled substances.

B. Financial documents, including credit card statements, tax returns, safe deposit records, safe deposit keys, bank records, bank statements, money orders, Western Union and other wire transfer company receipts, checking account records, cashiers checks, passbooks and other items evidencing the obtainment, concealment and/or expenditure of money.

C. Records, including address and telephone books (electronic or otherwise), telephone bills, cellular telephones, pagers, airline tickets, rental car records, storage unit rental records, false identification, other forms of identification, vehicle titles, vehicle registrations, records showing occupancy and/or ownership of the premises, receipts showing the purchase of chemicals and/or motel records.

D. Proceeds of an unlawful activity, including currency, jewelry, vehicles and other assets or financial records related thereto.

E. Photographs and/or videotapes including photographs and/or video tapes of co-conspirators, assets and/or controlled substances.

F. Controlled substances, including cocaine, marijuana, methamphetamine, heroin.

G. Drug paraphernalia and packaging materials, including scales, vacuum seal bags, plastic baggies and tape.

H. Firearms, ammunition, and magazines.

I. Cellular telephones, including "Smart" phones and records or data related to violations of 21 U.S.C. §§ 841 and 846, and 18 U.S.C. §§ 1956 and 1957, stored on any cellular telephones, including:

   1. Digital, cellular, direct connect, and/or other phone numbers, names, addresses, and other identifying information of customers, distributors, sources of supply and other associates;

   2. Digital, cellular, direct connect, and/or other phone numbers dialed from, which contacted, or which are otherwise stored on the cellular telephones, along with the date and time each such communication occurred;

3. Text message logs and text messages whether sent from, to, or drafted on, the cellular telephones, along with the date and time each such communication occurred;

4. The content of voice mail messages stored on the cellular telephones, along with the date and time each such communication occurred;

5. Photographs or video recordings;

J. The opening and search, and removal, if necessary, of any safe or locked receptacle or compartment, in which some or all of the property heretofore may be maintained.

# ATTACHMENT C

## AFFIDAVIT IN SUPPORT OF ORDER AUTHORIZING SEARCH WARRANTS

I, Gregory Hand, after being duly sworn, do hereby depose and state the following:

1. I am a Special Agent of the United States Department of Treasury, Internal Revenue Service – Criminal Investigation (IRS-CI) and have been so employed since January of 2004. As a Special Agent of IRS-CI, I have conducted investigations involving violations of 18 U.S.C. §§ 1956 and 1957 (Laundering of Monetary Instruments), 26 U.S.C. §§ 7201 and 7206 (violations of the Internal Revenue Code), and 31 U.S.C. § 5324 (violations of the Bank Secrecy Act).

2. Since approximately 2009, I have been assigned to narcotics task force operations responsible for financial investigations of individuals who derive substantial income from the illegal importation, manufacture, distribution and sale of illegal controlled substances. I have assisted and participated in these types of investigations with the Drug Enforcement Administration (DEA), Homeland Security Investigations (HSI), and the United States Attorney's Office (USAO). I have experience in the execution of financial search warrants and narcotics search warrants. I also have experience debriefing defendants, participant witnesses, informants, and other persons who have personal knowledge of drug trafficking methods and the amassing, spending, converting, transporting, distributing, laundering, promoting, and concealing of proceeds of narcotics trafficking. My educational background includes a Bachelor's of Accountancy, a Bachelor's of Business Administration in Finance, and a Master's of Accountancy.

3. Based on my training and experience, I am familiar with methods and practices used by individuals and organizations involved in drug trafficking and other illicit activities that generate large amounts of income. These methods include cash purchases, structuring of funds to avoid reporting requirements and identification of the true source of funding, the purchasing of numerous monetary instruments with cash in amounts less than $10,000, the use of aliases, straw purchasers, and nominees, and the use of businesses as "fronts" in an attempt to legitimize earnings from illegal operations. These and other schemes are commonly referred to as "money laundering."

4. Based upon my training and experience, I know that individuals who deal in illegal controlled substances routinely conceal in their residences, vehicles, places of operation, and places of business, caches of illegal controlled substances and drug paraphernalia, large amounts of currency, financial instruments, and other items of value and normally maintain records of their financial activity.

5. Based upon my training and experience, I know that individuals who deal in illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the transportation, ordering, sale, and distribution of illegal controlled substances. These individuals commonly "front" (provide illegal controlled substances on consignment) illegal controlled substances to their clients and thus keep some type of records concerning monies owed. The aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the dealer in illegal controlled substances has ready access to them including but

not limited to on his/her person, in his/her motor vehicles, in his/her place of business or place of residence. These individuals commonly utilize ledger books and computer systems to maintain these records.

6. Based on my training and experience, I know that individuals who deal in illegal controlled substances often keep photographs and videos of themselves and their co-conspirators, narcotics and their illegal profits.

7. Based on my training and experience, I know that individuals who deal in illegal controlled substances often maintain one or more cellular or "smart" telephones which contain information relating to their drug trafficking activities. That information includes contact lists, lists of recent call activity, stored text and voice mail messages, and photographs and videos.

8. Based on my training and experience, I know that individuals who deal in illegal controlled substances often carry weapons and ammunition to protect themselves, their narcotics, and their profits, and to intimidate other drug traffickers, and that they often conceal them on their property and persons.

9. Persons engaged in tax fraud, money laundering, and illegal controlled substances often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time. There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be considered harmless at first glance (e.g. financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize they still possess the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The criminal offender may also be under the mistaken belief that he/she has deleted, hidden or further destroyed any computer-related evidence, but which may be retrievable by a trained forensic computer expert.

10. Based on my training and experience, I know that individuals who deal in illegal controlled substances often maintain the above described items and documents in their primary residences, in their vehicles, and in stash houses, so as to afford them ready access to those items.

11. This affidavit is based upon my familiarity and investigation of this matter, as well as, conversations I have had with other members of law enforcement also involved in this investigation.

12. The information in this affidavit is based on my personal knowledge and from other sources of information specifically discussed herein. This affidavit does not include every fact and matter observed by me or known to the government relating to this investigation.

## ALLEGED OFFENSES

13. This affidavit provides probable cause to believe that Jesus N. Lopez-Tellez, Andrew Garza, and others, known and unknown, have conspired and committed overt acts in furtherance of the conspiracy to commit money laundering and distribution of a controlled substance, in violation of 18 U.S.C. §§1956 and 1957 and 21 U.S.C. §§841 and 846.

## LOCATIONS TO BE SEARCHED

14. Probable cause exists to believe that evidence of the aforementioned criminal violations (see Attachment B for a more detailed description of the items to be seized) is concealed within the following premises:

    (a) Subject Premises #1 (the residence of Jesus Noe Lopez-Tellez):
        310 N. 8th Street, Wolfforth, TX  79382, more fully described in Attachment A.

    (b) Subject Premises #2: (the residence of Andrew Garza):
        1928 67th Street, Lubbock, TX  79412, more fully described in Attachment A.

## PROBABLE CAUSE

## INTRODUCTION

15. This investigation was initiated when Special Agents from the Drug Enforcement Administration (DEA) conducted a controlled delivery of cocaine from El Paso, Texas, to Chicago, Illinois. Following the controlled delivery, DEA Agents were able to identify several members of a drug trafficking organization (DTO).

16. One individual identified was Hugo Lopez-Tellez (H. Lopez), who resides in Roswell, New Mexico. After taking investigative steps, agents were able to identify several DTO members associated with H. Lopez, such as Rodolfo Lopez (R. Lopez), Mayra Martinez-Giron (Martinez), Jesus N. Lopez-Tellez (N. Lopez), Andrew Garza (Garza), Christian Contreras (Contreras), Claudia Hernandez (Hernandez), Omar Ortiz (Ortiz), and Douglas Mayes (Mayes). During this investigation, agents obtained several court orders authorizing the interception of wire and electronic communications (phone calls and text messages) over phones used by Contreras, N. Lopez, H. Lopez, Hernandez, and Martinez. The intercepted calls and text messages, as well as surveillance of the targets' activities, provided agents with substantial evidence regarding the workings of the DTO.

17. R. Lopez and Martinez have been identified as the marijuana source of supply for Contreras. After Contreras receives marijuana from R. Lopez and Martinez, Contreras is the point of contact for both N. Lopez and H. Lopez to coordinate drug deliveries and money transactions. Contreras directs the duo of Hernandez and Ortiz to transport concealed narcotics from El Paso, Texas, to H.

Lopez in Roswell and N. Lopez in Lubbock. Hernandez and Ortiz also retrieve narcotics proceeds from H. Lopez and N. Lopez for concealed transportation back to Contreras in El Paso, Texas.

18. N. Lopez and H. Lopez are brothers and originally operated out of the Roswell, NM, area. H. Lopez's main source of income is narcotics trafficking, but N. Lopez holds legitimate employment with Walmart Stores, Inc., in addition to his illegal earnings from narcotics trafficking. I believe N. Lopez's reason for relocating to Lubbock was due to promotional opportunities with Walmart Stores, Inc. Based upon the investigation, I know that, after moving to the Lubbock area, N. Lopez continued to obtain and distribute narcotics in Lubbock and its surrounding areas, while H. Lopez remained in Roswell to continue trafficking narcotics in that area.

19. Based upon the ongoing investigation, I know that Garza is the primary purchaser of most of the marijuana obtained by N. Lopez. Intercepted calls revealed that before N. Lopez would receive a load of narcotics from Contreras, N. Lopez would call and arrange a meeting with Garza in order to pick up proceeds from Garza's previous marijuana sales. N. Lopez would then take the money received from Garza and provide it to Ortiz and Hernandez for transport back to Contreras as payment. After N. Lopez received a new drug load from Contreras, N. Lopez would call Garza and deliver the narcotics to him. Garza has an extensive criminal history to include aggravated assault with a deadly weapon, hindering apprehension of a known felon, multiple assault charges causing bodily injury, and multiple narcotics violations.

## NARCOTICS ACTIVITY

20. On November 24, 2014, a phone call was intercepted between Contreras and H. Lopez in which Contreras was inquiring about the funds from a previous narcotics delivery. H. Lopez proceeded to tell Contreras that Mayes had five or seven ready. I believe that Contreras had fronted a load of drugs to H. Lopez and wanted to know when he would be paid for the drugs. I further believe that H. Lopez was telling Contreras that Mayes had sold some of the drugs that H. Lopez had provided to Mayes and that Mayes had collected $5,000 or $7,000 in drug proceeds. The following day, November 25, 2014, H. Lopez called Contreras and told him that he sent five and that Mayes owes him "two four hundred." Based on my training and experience, I believe this is code for $2,400. Later that same day, H. Lopez called Contreras and told him "it's done" and informed Contreras that he was going to owe Contreras about four. Contreras asked H. Lopez 400 bucks to confirm, and H. Lopez replied in the affirmative. Based on my training and experience, I believe that H. Lopez had received a total of $7,000 in drug proceeds from Mayes and then sent the $7,000 to Contreras. I further believe that H. Lopez was indicating that Mayes still owed him $400, which H. Lopez in turn owed to Contreras.

21. On December 4, 2014, agents intercepted a call in which, H. Lopez called Contreras and asked if they were going to arrive. Contreras told him yes, and both parties referred to a female. Following that conversation, H. Lopez received a text from a phone subscribed to Hernandez telling H. Lopez she had arrived in Roswell and asking if she should proceed to H. Lopez's house. In the next text, she identified herself to H. Lopez as Hernandez. H. Lopez then replied yes and informed Hernandez he was at his house H. Lopez then called Contreras and asked him, in a coded manner, if he should conceal the money in a box or give the money to Hernandez in the open. Contreras

told Hernandez to provide it to Hernandez covered in a way that it can be accommodated. Law enforcement officers were able to surveil H. Lopez's residence at this time and observed Hernandez arrive at H. Lopez's residence at 909 Avenida Manana in her Toyota, Texas Plate DXT-4019. The Toyota was being driven by a male, later identified as Ortiz, and Hernandez was in the front passenger seat. H. Lopez was observed approaching Hernandez's Toyota and providing her with something small and wrapped through the passenger window. Hernandez then departed the area. Later that day, agents intercepted a call in which N. Lopez called H. Lopez and asked if the woman arrived. H. Lopez replied yes and that it was quick and that they just came and said thanks and left. Based on my training and experience, I believe that Hernandez and Ortiz delivered a load of marijuana to H. Lopez in Roswell, NM, and that H. Lopez provided money for the marijuana to Hernandez. I further believe that Hernandez then transported the money back to Contreras in El Paso, Texas.

22. The residence occupied by H. Lopez at 909 Avenida Manana, Roswell, New Mexico, is owned by his brother N. Lopez. N. Lopez is also the owner of Subject Premises #1 in Wolfforth, Texas, where he lives with wife and children.

23. On Wednesday, January 14, 2015, Contreras and Hernandez conversed via text messages, which were intercepted by agents. Hernandez, speaking in code, asked Contreras, how many brake pads she should take, Contreras replied, "just 20" and stated that they didn't have the rest for him but that Hernandez would go again with "Joto 2" on Sunday. Based on this investigation, I know that Contreras and Hernandez to refer to H. Lopez as "Joto 2," and I believe Contreras was telling Hernandez to deliver 20 pounds of marijuana to N. Lopez in Lubbock and that she would make a separate trip to deliver drugs to H. Lopez the following Sunday.

24. Also on January 14, 2015, agents intercepted a call in which N. Lopez informed Garza that N. Lopez wanted to go by when he got off of work to get the "bread" so he could be ready in the morning when "they" got there. Garza stated that he had fourteen or fifteen G's. N. Lopez stated he wanted to stop by at one (1:00). Based on my training and experience, I believe "bread" is code for money and that when N. Lopez referred to "they," he was referring to Ortiz and Hernandez. I believe that N. Lopez was telling Garza that he would go meet with Garza at Subject Premises #2 (Garza's house) in order to pick up the narcotics proceeds which Garza had so that N. Lopez could pay Hernandez and Ortiz when they arrived the following day with a new load of narcotics.

25. The morning of January 15, 2015, agents intercepted a call in which N. Lopez called Garza and told him "they" were on their way. N. Lopez told Garza that he would be on his way to pick "that" up and Garza concurred. I believe N. Lopez was informing Garza that a delivery was on its way and that N. Lopez was going to Subject Premises #2 to pick up the money from Garza.

26. Also on the morning of January 15, 2015, Hernandez' vehicle was identified passing through the Border Patrol checkpoint on Highway 62/180. Based upon the above described calls, I believe that Hernandez was travelling to N. Lopez' house (Subject Premises #1) in Lubbock, Texas, in order to deliver a load of narcotics to N. Lopez.

27. Later in the day on January 15, 2015 several calls were intercepted between N. Lopez, Contreras, G. Lopez (N. Lopez' wife), and Hernandez (speaking from G. Lopez' phone). Based on the

investigation, I know that Hernandez' minutes on her cellular phone had expired because she had not paid her bill, so she was forced to use G. Lopez' phone to call Contreras. N. Lopez was not answering his phone calls from G. Lopez, so Hernandez called Contreras from G. Lopez' phone, informing Contreras that N. Lopez was not there and was not answering his phone. After Hernandez had informed Contreras that they arrived, Contreras called N. Lopez, and N. Lopez stated he was on his way. N. Lopez also stated he wasn't answering because he was with Garza. Shortly thereafter, N. Lopez texted G. Lopez' phone, telling her to open up.

28. Based on the above calls, I believe that Hernandez arrived at Subject Premises #1 (N. Lopez' home) to deliver the load of marijuana, and that is why she was using G. Lopez' phone. I further believe that N. Lopez also texted G. Lopez' phone telling her to open up because he had arrived at Subject Premises #1, where G. Lopez and Hernandez were awaiting him. I also believe N. Lopez was with Garza at Subject Premises #2 prior to Hernandez's arrival so that N. Lopez could collect money from Garza. N. Lopez would then provide the money to Hernandez on her return trip to El Paso, and Hernandez would in turn give the money to Contreras.

29. Later that same day, Contreras called N. Lopez and asked to speak with Hernandez. N. Lopez handed Hernandez his telephone and Contreras told her to stop by H. Lopez' on the way back home.

30. Also on January 15, 2015, N. Lopez sent a text message to Garza telling him he would go by his place around 8 am the following day, January 16th. Based upon my training and experience, I believe N. Lopez was setting up a time to deliver to Garza the drugs that he had just received from Contreras and Hernandez.

31. Agents obtained a court order allowing them to obtain precise location information for Garza's cell phone. The location data showed that, in the morning hours of January 16, 2015, Garza was at Subject Premises #2. Surveillance at the residence led to the identification of Garza (who had only been called "Drew" on the intercepted phone calls) as Andrew Ocanas Garza.

32. Following Contreras' order for Hernandez to stop by H. Lopez' house on her return trip from Lubbock, agents were able to observe, via a pole camera that had a view of H. Lopez's house, Hernandez arriving at H. Lopez's in Roswell, NM. Agents observed Hernandez exit the passenger side of the vehicle and approach the door, obtain a package, and then depart. Based upon these occurrences, I believe Hernandez, after making a drug delivery to N. Lopez in Lubbock, stopped by Roswell, New Mexico, on her return trip to retrieve additional drug proceeds from H. Lopez for delivery to Contreras.

33. On January 17, 2015, agents intercepted a call in which Garza talked to N. Lopez and asked N. Lopez if N. Lopez wanted to come by and pick up money. Garza told N. Lopez that he had "five" for him. N. Lopez said he was working but wanted to swing by around 10. In a call approximately an hour later, N. Lopez called Garza and told him he would be there in 10 minutes. Agents obtained location information for Garza's cell phone and determined that, at the time of these calls, Garza was at Subject Premises #2. Based on my training and experience, I believe that N. Lopez was going to Subject Premises #2 in order to pick up $5,000 in drug proceeds from Garza.

34. On January 23, 2015, agents intercepted a call between N. Lopez and Contreras, in which Contreras asked if N. Lopez has obtained a new cellular phone. N. Lopez informed Contreras that he had not bought a new phone and explained to Contreras why he hadn't. Contreras criticized N. Lopez and urged him to purchase a new phone.

35. On January 29, 2015, a conversation between N. Lopez and H. Lopez was intercepted in which N. Lopez told H. Lopez that he had found the $3,000 he thought he had lost. N. Lopez recounted to H. Lopez that they had been drunk and he had went to the room to get the $3,000. N. Lopez then says that he can now pay him, referring to Contreras. The money N. Lopez found was located in the glove compartment of his vehicle. I believe N. Lopez was talking about Subject Premises #1 when he refers to going into "the room" and that N. Lopez, apparently drunk, had taken $3,000 from Subject Premises #1 and put it in the glove box of his vehicle.

36. On January 30, 2015, agents intercepted a text in which Contreras told N. Lopez that he would be there the following day. On the morning of January 31st, agents reviewed footage from a pole camera at Contreras' residence and observed a male and female believed to be Hernandez and Ortiz transferring what appeared to be clothing items to a grey sedan resembling Hernandez' grey Toyota sedan. The sedan departed at approximately 5:26 a.m. At approximately 10:06 a.m., Hernandez called and told N. Lopez she would be there in ten minutes. At approximately 11:04 a.m., Contreras called N. Lopez and asked him if the guys were on their way back. N. Lopez said they had already left and inquired why Contreras had sent him so little. Based on my training and experience, I believe that Hernandez and Ortiz had delivered a load of narcotics to N. Lopez at Subject Premises #1, and that N. Lopez was complaining about the small nature of the drug load. Contreras and N. Lopez continued to discuss the amount of money N. Lopez owed to Contreras. N. Lopez told Contreras he sent him about ten thousand one hundred.

37. After Hernandez and Ortiz left N. Lopez' residence, an Eddy County Sheriff's Deputy conducted a traffic stop on Hernandez and Ortiz for travelling 95 miles per hour in a 45 mile per hour speed zone. Members of the Pecos Valley Drug Task Force obtained consent to search and located bundles of money concealed under a seat cushion of the vehicle, later determined to be $10,115 in United States currency. I believe that this was the money that N. Lopez had provided to Hernandez and Ortiz when they delivered a load of drugs to him at Subject Premises #1. Also with the money was a note to Contreras from N. Lopez with an accounting of how much N. Lopez believed that he owed Contreras. This note was written on Walmart receipt paper, where N. Lopez is employed. On February 14, 2015, agents intercepted a phone call where N. Lopez spoke with Contreras and was concerned about the note he had placed with the seized funds that was intended for Contreras. Contreras told N. Lopez that nothing was said about it and that Hernandez had explained to the officers that the note was in reference to light bulbs that they were buying.

38. At approximately 7:36 p.m. on January 31, 2015, N. Lopez and Garza spoke telephonically and Garza asked N. Lopez to come by when he needed that "bread." Garza also asked N. Lopez if he had received twenty, and N. Lopez affirmed. N. Lopez stated he would go over to Subject Premises #2 early the next day since he was going to Roswell afterwards to visit H. Lopez. The following day, February 1, 2015, location data for Garza's phone indicated he was at Subject Premises #2 from 3:30 a.m. until 2:36 p.m.

39. On February 9, 2015, Garza and N. Lopez were intercepted discussing the lack of shipments from Contreras. Garza informed N. Lopez that he had four and would give N. Lopez a thousand. N. Lopez then asked if Garza would be home later and Garza affirmed.

40. On February 18, 2015, agents intercepted calls in which Contreras directed Hernandez to transport another load to N. Lopez in Lubbock. Hernandez and Contreras talked on the telephone about arranging alternative transportation for the load, and Hernandez talked about renting a car and explained how she had to drive the rental around El Paso, Texas in order to get the fuel level low (note: This DTO conceals marijuana in the gas tank of vehicles by removing the back seat and fuel sending unit of the vehicle and dropping marijuana into the gas tank). Based on the phone calls, agents learned that Hernandez and Ortiz arrived in Lubbock but could not reach N. Lopez to rendezvous. Calls and texts were made between N. Lopez, Hernandez, Ortiz, Contreras, G. Lopez, and H. Lopez to determine where N. Lopez was and when he would be present at Subject Premises #1 to receive the marijuana and provide payment.

41. While N. Lopez was leaving work to go to Subject Premises #1 and unload the marijuana transported by Hernandez and Ortiz, N. Lopez called Garza and asked if Garza could deliver the money to him since he was late and Hernandez and Ortiz had been waiting for him. During the phone conversation, Garza seemed reluctant, but agreed. N. Lopez asked Garza if he remembered how to get there. Because N. Lopez asked Garza if he remembered the way to Subject Premises #1, I believe that this further proves that the aforementioned money pick-ups by N. Lopez from Garza occurred at Garza's residence, Subject Premises #2.

42. Hernandez and Ortiz were eventually let into the garage of Subject Premises #1 by a young man, presumably N. Lopez' son, and eventually G. Lopez spoke to Contreras about not being able to unload the marijuana because she didn't remember how. Hernandez, who was present with G. Lopez at N. Lopez' house, reported to Contreras that G. Lopez was thinking about taking out the drugs, but that wouldn't do any good because G. Lopez did not know what amount of "papers" to send back to Contreras. Based on the investigation, I know Hernandez and Contreras to refer to money as papers and/or receipts. G. Lopez also texted Contreras asking him how much they had, referring to the amount of dope Hernandez and Ortiz had, and told Contreras that she could help get it out if he wanted her to. N. Lopez eventually arrives at Subject Premises #1, and agents believe the load was delivered successfully.

**FINANCIAL ACTIVITY**

43. N. Lopez and Garza have financial activity indicative of narcotics trafficking and money laundering. In addition to the bulk cash smuggling described in earlier paragraphs of this affidavit, N. Lopez and his spouse G. Lopez are making cash payments on loan obligations, purchasing money orders, and have unexplained wealth.

44. According to tax records required for the purchase of their residence at 310 N 8th Street, Wolfforth, Texas (Subject Premises #1), N. Lopez is the sole income earner for the family. On personal income tax returns, Forms 1040, for the years 2012 and 2013, G. Lopez is listed as a homemaker. The wages on Forms 1040 are commensurate with paystubs received from N. Lopez' place of

employment. For tax years 2012 and 2013, claimed wages were $41,988 and $51,263 respectively.

45. G. Lopez appears to unemployed due to no wages being claimed on personal income tax returns and negative results of wage databases for the States of New Mexico and Texas. The wage database indicated G. Lopez had not worked since the first quarter of 2010.

46. G. Lopez and N. Lopez claim two children and N. Lopez' mother on their tax return. Based upon court authorized intercepted phone calls, N. Lopez' mother resides in the Republic of Mexico, and it is unknown whether N. Lopez truly provides the necessary support of his mother in order to properly claim her as a dependent on his personal income taxes.

47. According to Bank of America mortgage documents, N. Lopez and G. Lopez purchased a residence at 909 Avenida Manana on or about February of 2011. The monthly mortgage payment is approximately $871, and the loan amount was approximately $98,606.

48. As of September 3, 2014, 48 mortgage payments had been made on the Avenida Manana residence, of which 10 were cash payments totaling $6,925. Following their move to the Lubbock, Texas area, the Avenida Manana residence was rented to N. Lopez' brother H. Lopez. Based upon tax records, it appears as though the renting took place sometime in 2012. As noted above, H. Lopez has utilized this residence to receive marijuana shipments and conceal narcotics proceeds.

49. On or about March 13, 2014, N. Lopez and G. Lopez purchased Subject Premises #1 for approximately $178,500, and they have a monthly mortgage payment of approximately $1,632.

50. On or about February of 2012, N. Lopez and G. Lopez purchased a Ford F-150 Raptor for $51,397 and provided a $5,000 cash down payment. Financing was initially through Wells Fargo Dealer Services, before being refinanced with Texas Tech Federal Credit Union (TTFCU). While the vehicle was financed with Wells Fargo Dealer Services, 24 payments were made. 23 of the payments were made with money orders purchased by G. Lopez. After being refinanced with TTFCU, 12 payments have been made on the Raptor, with 10 of them being made with cash.

51. On January 18, a conversation was intercepted between N. Lopez and G. Lopez in which N. Lopez told G. Lopez that he picked up money from Garza and can now make the payment on the truck.

52. On or about July 11, 2014, N. Lopez and G. Lopez purchased a 2011 BMW X5 for $41,673, less a trade in value of $24,000. This vehicle was financed by Wells Fargo Dealer Services and, of the 6 payment records agents have in their possession, all six were made by Money Gram Money Orders purchased by G. Lopez.

53. On February 5, 2015, a conversation was intercepted between N. Lopez and a male named Brian, who based upon his statements, is also a drug dealer and associate of N. Lopez'. The conversation was regarding paying taxes and using false dependents to lower taxable income. During the conversation, N. Lopez told Brian that he would never claim the other money, which I believe to be a reference to his earnings from narcotics trafficking.

54. N. Lopez' primary source of supply, Contreras, has been identified as owning an automotive repair and customization shop named Motor City, located in El Paso, Texas. I believe this business to be a front company to conceal Contreras' drug trafficking profession and proceeds. The owner of record for Motor City and the only name on the Motor City bank accounts is Brenda Hernandez, Contreras' wife. Agents have received bank records regarding Brenda Hernandez and Motor City, and they resemble that of personal banking accounts rather than operating business accounts.

55. On April 7, 2011, a personal bank account belonging to Brenda Hernandez had a cash deposit of $3,800 made in Roswell, New Mexico. Since the dollar amount was underneath the $10,000 reporting requirement, Wells Fargo Bank, NA was under no obligation to identify the individual making the deposit. This Roswell deposit occurred while N. Lopez was still residing in Roswell, New Mexico, prior to his move to the Lubbock, Texas area. In my experience, this type of activity is commonly used by narcotics traffickers and money launderers and the term used to describe this process is "funnel accounts."

56. On April 4, 2012, a cash deposit of $500 was made into the Wells Fargo Motor City bank account from Roswell, New Mexico.

57. On October 7, 2013, a cash deposit of $4,000 was made into the Wells Fargo Motor City bank account from Roswell, New Mexico.

58. On October 11, 2013, a cash deposit of $2,800 was made into the Wells Fargo Motor City bank account from Lubbock, Texas. N. Lopez had relocated to Lubbock, Texas by this time.

59. On October 18, 2013, a cash deposit of $1,200 was made into the Wells Fargo Motor City bank account from Lubbock, Texas.

60. On February 18, 2014, a cash deposit of $1,500 was made into the Bank of America Motor City bank account from Lubbock, Texas.

61. It has been my experience that narcotics traffickers use funnel accounts to quickly move amounts between destination points and the source of supply. Usually these transactions are used to take care of immediate expenses, such as paying load drivers and stash house operators. The amount of proceeds deposited into funnel accounts usually represent a smaller percentage of the amount of proceeds bulk currency smuggled back to the source of supply.

62. I believe that N. Lopez and his brother H. Lopez have utilized the bank accounts of Motor City and Brenda Hernandez to deliver drug proceeds to their source of supply, Contreras.

## NO-KNOCK SEARCH WARRANT SERVICE

63. I am requesting authority be granted to execute search warrant at Subject Premises #2 without the requirement of prior announcement of identity and purpose (commonly referred to as "no knock service") in the interest of safety of the participating agents, evidence preservation, and the safety

of those residents living in the surrounding neighborhood. Additional justification (in addition to the above detailed probable cause) for "no-knock" service is listed below:

a. Andrew Garza, who lives at Subject Premises #2, has an extensive criminal history. Furthermore, Garza's criminal history includes numerous violent offenses. Based upon criminal history records, Garza has the following arrests and convictions:
   i. 09/21/1994 Assault with a deadly weapon (disposition unknown).
   ii. 12/04/1994 Marijuana possession (convicted).
   iii. 03/20/1995 Evading arrest or detention (convicted).
   iv. 09/05/1995 Hindering the apprehension/prosecution of a known felon (convicted).
   v. 06/29/1998 Assault Causing Bodily Injury (convicted).
   vi. 07/19/2000 Manufacture/delivery of a controlled substance (disposition unknown)
   vii. 07/07/2001 Assault causing bodily injury/evading arrest (convicted)
   viii. 12/07/2002 Possession of a controlled substance (convicted)
   ix. 05/02/2003 Possession of a controlled substance (disposition unknown)
   x. 11/06/2006 Evading arrest (convicted)
   xi. 10/26/2008 Prohibited substance in a correctional facility (convicted)
   xii. 11/07/2008 Kidnapping, charge changed to battery of a family member (disposition unknown)

64. Based on Garza's criminal history, I believe that Garza may become violent when agents attempt to search his house. Because I know that many drug traffickers keep firearms in their homes in order to protect themselves, their drugs, and their profits, I also believe that it is likely that Garza will have firearms at Subject Premises #2.

65. Furthermore, the time delay between when agents knock on the door and announce their presence and when they enter the residences may be used by the occupants to destroy or conceal evidence, because narcotics are easily disposable, often being flushed down the toilet. For these reasons, I have requested a tactical/SWAT teams serve the search warrant at Subject Premises #2. Because of the Garza's criminal history and the likelihood of violence, the SWAT team has informed me that, if they are not authorized to enter without "knocking and announcing," they will use a bullhorn to call all of the residents out of Subject Premises #2, and that they will not enter the premises until the occupants have all exited the house. This significantly increases the likelihood that the residents of the premises will conceal or destroy evidence before police are able to enter the residence. For these reasons, I hereby request permission to execute the search warrant without first knocking and announcing the police presence.

## CONCLUSION

66. Evidence obtained indicates that N. Lopez and Garza are trafficking narcotics and that they are using Subject Premises #1 and Subject Premises #2 to conceal narcotics and drug proceeds.

67. The evidence also shows that N. Lopez is conducting financial transactions, or causing financial transactions to be conducted, using cash and money orders derived from illegal proceeds. I know this type of activity to be indicative of drug trafficking and money laundering where violators attempt to conceal the true nature and source of wealth by using cash payments or bearer

instruments to avoid placing unexplained wealth in personal bank accounts and making tracking of such transactions more difficult.

68. Based on all the foregoing facts, there is probable cause to believe that Jesus Noe Lopez-Tellez and Andrew Garza are engaged in the criminal activities of narcotics trafficking and money laundering. I believe there exists probable cause that Subject Premises #1 and Subject Premises #2 contain evidence of violations of 18 U.S.C. § § 1956 and 1957, and 21 U.S.C. §§ 841 and 846.

69. Furthermore, based upon the foregoing, I believe there is reasonable suspicion to believe that compliance with the "knock and announce" rule, pursuant to 18 U.S.C. § 3109, at Subject Premises #2 would be dangerous, futile, and destructive to the purposes of the investigation, and therefore request permission to enter the Subject Premises without first knocking.

70. Should this affidavit in support of the requested search warrants be authorized, the agents who execute this warrant may make a forcible entry into Subject Premises #2 without giving notice, unless a change in circumstances, at the time of service, negates the need for non-compliance.

Respectfully submitted,

IRS SA Gregory Hand

Sworn to before me and subscribed in my presence on this 20th day of April, 2015.

NANCY M. KOENIG
United States Magistrate Judge